# 14-1764-cv(L)
## 14-1983-xap, 14-1990-xap

# United States Court of Appeals
*for the*
# Second Circuit

LYNSEY THOMPSON,

*Plaintiff, Appellee, Cross-Appellant,*

RANDOM VENTURES, INC., KEVIN BRITTINGHAM,

*Plaintiffs, Counter-Defendants,*
*Appellees, Cross-Appellants,*

– v. –

ADVANCED ARMAMENT CORP. LLC, REMINGTON ARMS
COMPANY, LLC,

*Defendants, Counter-Claimants,*
*Appellants, Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLANTS ADVANCED ARMAMENT CORP. LLC & REMINGTON ARMS CO., LLC

JOHN D. ADAMS
DANA L. RUST
MATTHEW A. FITZGERALD
MCGUIREWOODS LLP
901 East Cary Street
Richmond, VA 23219
Tel: 804.775.4716
Fax: 804.698.2251
jadams@mcguirewoods.com
drust@mcguirewoods.com
mfitzgerald@mcguirewoods.com

LINDA T. COBERLY
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: 312.558.8768
Fax: 312.558.5700
lcoberly@winston.com

*Attorneys for Advanced Armament Corp. LLC, Remington Arms Co., LLC*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

Under Federal Rule of Appellate Procedure 26.1, counsel for appellants Advanced Armament Corp., LLC, and Remington Arms Co., LLC, certifies:

The sole parent of Advanced Armament Corp., LLC, is Remington Arms Co., LLC.

Remington Arms Co., LLC, is wholly owned by FGI Operating Co., LLC, which is wholly owned by FGI Holding Co., LLC, which is wholly owned by Remington Outdoor Company, Inc. (formerly Freedom Group, Inc.)

No publicly held company owns 10 percent or more of either Advanced Armament Corp., LLC, or Remington Arms Co., LLC.

# TABLE OF CONTENTS

Corporate Disclosure Statements ..................................................................... i

Table of Authorities ...................................................................................... iv

Preliminary Statement .....................................................................................1

Jurisdictional Statement ..................................................................................3

Statement of Issues ..........................................................................................4

Statement of the Case .....................................................................................5

1. The Highly Regulated World of Firearms ..............................................5
2. Old AAC ...............................................................................................7
3. Terms of Remington's Acquisition of Old AAC ...................................8
4. Brittingham's and Thompson's Employment Agreements .....................9
5. Licenses and Operation at Time of Acquisition ................................. 10
6. Compliance at New AAC .................................................................... 11
7. AAC's move to Lawrenceville and Changes at FGI............................ 13
8. Brittingham's and Thompson's Suspension and Terms of Return ....... 14
9. Misconduct after Brittingham's Suspension ....................................... 16
10. Efforts to Hire Compliance Personnel................................................ 17
11. Machine Guns at AAC ....................................................................... 18
12. Photo Shoot and the Knox Williams List ........................................... 19
13. Brittingham's Termination ................................................................. 22
14. Thompson's Termination ................................................................... 23
15. Lawsuit, Trial, and Judgment ............................................................ 24

Summary of Argument ................................................................................ 26

Argument .................................................................................................... 30

I. AAC did not breach Brittingham's employment agreement by firing
   him for breaking the law ..................................................................... 30

   1. AAC had cause to fire Brittingham because he and his
      subordinates committed multiple felony violations of
      federal firearms laws with Brittingham's weapons ......................... 31

      a.   Brittingham committed, caused, and allowed
          rampant violations of federal firearms laws .............................. 31

      b.   The district court erred in holding that the
          violations were not "material." ................................................. 38

  2.  Brittingham's employment agreement did not require
     action by the AAC Board of Directors before he could
     be fired for breaking the law ........................................................... 41

II.   AAC did not breach Ms. Thompson's employment agreement by
terminating her for failing to fully cooperate in an investigation. ........ 44

  1.  Thompson's refusal to turn over the recording
     constituted a failure to "fully cooperate" in an
     "investigation" for purposes of clause (F)...................................... 45

  2.  Clause (F) requires no written notice or opportunity to
     cure—only a "reasonabl[eness] determination" by the
     Board, which was properly made in this case ................................ 49

III.  The district court erred by allowing Brittingham to maintain his
claims for breach of the implied covenant of good faith and fair
dealing, and clearly erred by finding bad faith...................................... 51

  1.  The breach of the implied covenant of good faith and
     fair dealing claims were duplicative of Brittingham's
     contract claims because they sought identical damages ................ 51

  2.  The district court clearly erred by finding bad faith ...................... 55

IV.  Attorney's fees were awarded in error because the contract here
does not "clearly" shift attorney's fees.................................................. 59

  1.  New York law requires contractual fee-shifting
     provisions to be "unmistakably clear" on that point ...................... 59

  2.  The Asset Purchase Agreement is not "unmistakably
     clear" because it does not "clearly state" that the parties
     intended the loser in a suit for breach to pay the
     winner's fees.................................................................................. 61

Conclusion ....................................................................................... 65

Certificate of Compliance ............................................................... 66

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Carco Grp., Inc. v. Maconachy*,
    718 F.3d 72 (2d Cir. 2013) .................................................. 38, 41, 49, 59

*Coastal Power Int'l Ltd v. Transcontinental Capital Corp.*,
    182 F.3d 163 (2d Cir. 1999) ....................................... 30, 60, 62, 63, 64

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F.Supp.2d 162 (S.D.N.Y. 2011) ................................................... 52

*Kader v. Paper Software, Inc.*,
    111 F.3d 337 (2d Cir. 1997) ......................................................... 52, 55

*LoPresti v. Terwiliger*,
    126 F.3d 34 (2d Cir. 1997) .................................................................. 52

*Oscar Gruss & Son, Inc. v. Hollander*,
    337 F.3d 186 (2d Cir. 2003) ............................................................... 59

*Private One of N.Y., LLC v. JMRL Sales & Serv.*,
    471 F. Supp. 2d 216 (E.D.N.Y. 2007) ................................................ 64

*U.S. ex rel. Palermo v. Smith*,
    17 F.2d 534 (2d Cir. 1927) .................................................................. 43

*United States v. Mitchell*,
    966 F.2d 92 (2d Cir. 1992) .................................................................. 55

*United Indus., Inc. v. Simon-Hartley, Ltd.*,
    91 F.3d 762, 764 (5th Cir. 1996) ........................................................ 64

*United States v. Toner*,
    728 F.2d 115 (2d Cir. 1984) ............................................................... 39

*United States v. Tarrant*,
    460 F.2d 701 (5th Cir. 1972) .............................................................. 39

## STATE CASES

*Betts v. Univ. of Rochester*,
    507 N.Y.S.2d 566 (N.Y. App. Div. 1986) .......................................... 54

*Deer Park Enters., LLC v. Ail Sys.*,
  57 A.D.3d 711 (N.Y. App. Div. 2008) ........................................ 29, 52

*Getty v. Roger Williams Silver Co.*,
  221 N.Y. 34 (1917) ............................................................. 54

*Gotham Partners, L.P. v. High River Ltd. P'ship*,
  76 A.D.3d 203 (N.Y. App. Div. 2010) .............................................. 59

*Hooper Assocs. Ltd. v. AGS Computers*,
  548 N.E.2d 903 (N.Y. 1989) ................................ 29, 30, 59, 60, 62, 64

*Kilian v. Ferrous Magnetic Corp.*,
  280 N.Y.S. 909 (N.Y. App. Div. 1935) ............................................. 54

*Smile Train, Inc. v. Ferris Consulting Corp.*,
  986 N.Y.S.2d 473 (N.Y. App. Div. 2014) ........................................ 52

## STATUTES AND REGULATIONS

18 U.S.C. §922(o) .................................................... 6, 7, 27, 32, 34

18 U.S.C. §923(g)(1) ............................................ 6, 31, 32, 35, 36

18 U.S.C. §924(a) ....................................................... 7, 31, 34

26 U.S.C. §5861 ........................................... 7, 27, 31, 34, 38, 39

26 U.S.C. §5871 ....................................................... 31, 34, 38

28 U.S.C. §1291 .............................................................. 3

28 U.S.C. §1332(a) ........................................................... 3

27 C.F.R. §479.105 ....................................................... 7, 12

27 C.F.R. §478.123–25 .................................................... 6, 36

ATF Ruling 2010-1 ...................................................... 31, 34

# PRELIMINARY STATEMENT

The district court's ruling in this breach of contract case suffers from several fatal errors of law. The case arises out of the termination of Kevin Brittingham, the former president of Defendant Advanced Armament Corp., LLC ("AAC"), a division of Remington Arms Company, LLC ("Remington"). Before he joined AAC, Brittingham owned his own business manufacturing silencers for firearms, including machine guns. AAC purchased his business, and Brittingham became an AAC employee with an employment contract. After several tumultuous years, however, AAC fired Brittingham for cause, based on his persistent "material failure" to comply with the federal firearms laws and regulations that are so important in this highly regulated industry.

In particular, Brittingham owned numerous machine guns that AAC employees feloniously transported and feloniously possessed. Brittingham was the legally "responsible person" on the federal licenses (his own) that listed those machine guns. He was also the immediate supervisor of the AAC department where those crimes occurred. And he was specifically aware of the legal requirements and the fact that they were being violated.

Yet, the district court found that these violations were not "material" and thus could not constitute "cause" for termination. This conclusion is

1

impossible to reconcile with either the factual record or the federal firearms laws themselves, which provide stiff penalties and lengthy prison terms for these exact violations. Moreover, the district court's ruling reflects a fundamental misreading of the employment agreement, injecting procedural requirements into the "cause" provision that cannot be reconciled with the provision's plain language.

Plaintiff Lynsey Thompson, Brittingham's "right hand person," was terminated shortly thereafter for cause when she failed to cooperate with the ensuing AAC investigation, refusing to turn over the audiotape of her interview with AAC's counsel. The district court found this termination was improper because Thompson never received written notice and an opportunity to cure. But again, this conclusion squarely conflicts with the plain language of the relevant "cause" provision in her contract, which has no such "written notice" requirement. Further, the one-member AAC Board of Directors specifically testified that he understood failing to hand over the tape was a "termination offense," and that he had received and approved a recommendation that she be terminated. Under those circumstances, Thompson received her due under her contract.

In light of these errors, this Court should reverse the judgment awarding damages to the plaintiffs on the claims for breach of contract.

Because there was no breach of contract, the Court should also reverse the judgment awarding damages on the parallel claims for breach of the implied covenant of good faith and fair dealing—which should never have reached judgment regardless because they sought identical damages to the breach of contract claims.

And finally, even if the plaintiffs' claims had been meritorious, it was improper to award $1.6 million in attorney's fees. The indemnification provision at issue is not "unmistakably clear" in shifting fees; in fact, it is indistinguishable from contract language that both the New York courts and Second Circuit have found did *not* shift fees.

## JURISDICTIONAL STATEMENT

The U.S. District Court for the Southern District of New York had diversity jurisdiction over this case under 28 U.S.C. §1332(a). The amount in controversy exceeds $75,000, and the parties are diverse: plaintiffs are citizens of Georgia and the defendants are Delaware LLCs with members from Delaware and North Carolina. Complaint, JA45–46.

This Court has jurisdiction under 28 U.S.C. §1291. The district court entered final judgment on May 12, 2014, SA144, disposing of all claims in the case, and defendants timely filed a notice of appeal on May 23. JA1080.

3

## STATEMENT OF THE ISSUES

1.      Did the district court err in concluding that AAC lacked "cause" to terminate Kevin Brittingham for "material failure by [him] to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his duties," JA795, when Brittingham and his subordinates committed multiple felony violations of federal gun control laws with his weapons?

Further, did the district court err in holding that a requirement in a different clause that the Board of Directors "reasonably determin[e]" whether cause to terminate Brittingham existed apply also to clause (B), although no party argued that it did to the district court?

2.      Did the district court err in concluding that AAC could not terminate Lynsey Thompson for "failure to fully cooperate in any investigation or audit of the Company or its affiliates," JA806, because she did not receive "written notice" in advance, when no such "written notice" requirement appears in this provision of the contract?

Further, did the district court err by finding that the Board of Directors failed to "reasonably determin[e]" that cause existed, when the sole member of the Board received and approved a recommendation that Thompson be terminated?

3.      Did the district court err as a matter of law by permitting
Brittingham to maintain his claims for breach of the implied covenant of
good faith and fair dealing, when those claims precisely duplicated his
damages demand under his parallel breach of contract claims?  If not, did the
district court clearly err by finding bad faith?

4.      Did the district court err as a matter of law in awarding
attorney's fees to Brittingham when the contract contains an indemnification
clause but does not "clearly state the parties intended the loser in a suit for
breach of the agreement to pay the winner's attorney's fees"?

## STATEMENT OF THE CASE

After their respective terminations, Brittingham and Thompson
brought this suit for breach of contract.  Follwing a bench trial, the
Honorable Judge Katherine B. Forrest found they had been terminated
without cause (and that AAC and Remington acted in bad faith) and
awarded damages in their favor.  2014 WL 113745 (S.D.N.Y. Jan. 13, 2014)
(hereinafter SA1–117).  The pertinent facts—and the specifics of Judge
Forrest's decision—are discussed in more detail below.

### 1.      *The Highly Regulated World of Firearms*

Firearms manufacturers, including silencer manufacturers, operate "in
a highly regulated environment."  SA18.  Each manufacturer must hold a

5

federal firearms license ("FFL"). Each FFL lists one or more "responsible persons" who must maintain a log, called a "bound book," of all firearms associated with that FFL. SA19; 18 U.S.C. §923(g)(1)(A). The bound book must reflect the receipt or manufacture of each firearm, as well as its disposition when sold or otherwise transferred. *Id.*; 27 C.F.R. §478.123–25.

As relevant here, at least three different levels of regulation exist, depending on the type of firearm. The first level of regulation applies to common hunting rifles and handguns—the types of firearms that private gun owners most often possess. When possessed by a manufacturer, these weapons must be logged into and out of its bound books. JA111. Certain firearms listed in the National Firearms Act ("NFA") also receive a second, more stringent layer of regulation. These include machine guns, silencers, grenade launchers, and destructive devices. JA107. Transferring these so-called "NFA firearms" requires submitting a form to the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and waiting for authorization to make the transfer. JA116. The third, most stringent level of regulation applies to machine guns specifically. Machine guns built or imported after 1986 essentially cannot be transferred at all without individualized letters from law enforcement. 18 U.S.C. §922(o). Law enforcement allows such transfers only under special circumstances, such as demonstrations for law

enforcement, or when an FFL goes out of business.  27 C.F.R. §479.105.

Transferring machine guns improperly constitutes at least two felonies.  18

U.S.C. §922(o), §924(a)(2) (up to 10 years in prison for a knowing violation

of §922(o)); 26 U.S.C. §5861(b), (d), and (e).

    2.    *Old AAC*

    In 1994, Kevin Brittingham started a silencer company in his parents'

garage.  SA1; JA102.  Under Brittingham, his Advanced Armament Corp.

("Old AAC") acquired some 40 patents and steadily grew into an industry

leader.  SA1, 3; JA102.  Ultimately, it attracted the attention of major

firearms maker Remington and its parent, Freedom Group Inc. ("FGI").

SA2; JA352.

    In the district court's words, Brittingham was "a non-conformist and

not everyone's cup of tea;" he "would not fit well in most corporate

boardrooms, nor would he want to."  SA4.  Brittingham promoted an

"untraditional company culture" at Old AAC that included taking military

clients to strip clubs and aerial pig hunting.  SA3, 6.  The district court

believed that it was obvious that although Brittingham was a successful

businessman, he would never survive a chain of command in a big

corporation.  SA4, 9, 7.

Nonetheless, Brittingham and his business manager, Lynsey Thompson, saw a real, concrete benefit in teaming up with a large, well-established corporation like Remington. As the "biggest gun company in the world," Remington could boost research and development through "rapid prototyping capability," could "invest the capital necessary to grow production," and could develop the company's finance, compliance, and distribution systems. SA8. Selling to Remington would also create a multi-million-dollar payday for Brittingham. SA9.

### 3. Terms of Remington's Acquisition of Old AAC

Sophisticated counsel represented all parties. JA138. They ultimately arrived at a deal structured as an asset purchase in which Remington formed a new "AAC" entity and purchased the assets of Brittingham's company. Remington paid Brittingham $10,160,000 up front for Old AAC. SA12. As part of the deal, Brittingham certified that Old AAC and its plant in Norcross, Georgia, complied with federal firearms regulations. SA7, n.6.

In October 2009, Brittingham took the $10 million and agreed to become a corporate employee—the president of new AAC. SA9. Everyone from his old company continued to report to Brittingham. JA353. He also agreed that, if he could remain employed by AAC until 2015 and lead the business to certain financial targets by that time, he would receive $8 million

more.  SA9.  Having assessed Brittingham's attitude in person, SA4, the district judge came to the conclusion that Brittingham was no more likely to "maintain his position for a period of five years" than to "tread on logs atop a running river" for that long.  SA9.  Still, Brittingham himself—represented by sophisticated counsel—accepted this arrangement notwithstanding any reservations he might have had about fitting into a corporate culture.

AAC was established as a separate profit-and-loss center within Remington Defense.  SA8.  Brittingham would report directly to Jason Schauble, a former Marine and recipient of the Silver Star and Bronze Star, who in turn reported directly to the Chief Executive Officer of FGI, Ted Torbeck.  SA7, 8; JA352.

### 4. *Brittingham's and Thompson's Employment Agreements*

Brittingham could only be fired for "cause," as defined in his employment agreement.  SA16.  As relevant here, "cause" included "material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of his duties."  SA16 (quoting clause (B)).

Lynsey Thompson also signed an employment agreement providing that she too could be fired only for "cause."  Her "cause" provisions were the same as Brittingham's.  SA17.  Most relevantly, AAC could fire

Thompson for "failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company."  SA17 (quoting clause (F)).

     5.     *Licenses and Operation at the Time of Acquisition*

At the time of the acquisition, Brittingham owned and operated two federal firearms licenses ("FFLs").  AAC purchased all of the old company's silencer inventory.  Of the collection of guns used for research and development, as well as for marketing, AAC purchased many, but not all.  Firearms listed on the excluded assets schedule remained the property of Brittingham or his sole proprietorship.  Schauble testified that AAC had purchased "the minimum amount of firearms we needed," JA352, but Brittingham testified that some of the guns he did not sell would be necessary to AAC's ongoing research and development.  SA11.

In order for AAC to use Brittingham's firearms lawfully, Brittingham had to maintain "dominion and control" over those firearms at all times.  SA32–33.  This required that Brittingham be "present at AAC's premises" when his guns were being used by AAC employees.  SA32; JA333–34.  Dominion and control was necessary to avoid unlawful, unauthorized "transfers" of the firearms, including machine guns.

6. *Compliance at New AAC*

After the acquisition, compliance got off to a rocky start at AAC. FGI clearly cared about compliance. In fact, immediately after the acquisition, it ordered AAC to stop production for a month out of concern that AAC's parts suppliers needed, but did not have, the necessary FFLs. JA188. Eventually the suppliers complied and AAC resumed production. The production delay annoyed Brittingham. *Id.*

Roger Mustian, head of compliance at FGI and Remington, also provided guidance from his office in North Carolina. Within days of the acquisition, he conducted a three-hour firearms regulatory training for AAC employees. JA332. He also approved sending an AAC employee to multi-day ATF training in Arizona. JA284, 374.

Ten days after the acquisition, Mustian created an "AAC Integration Scorecard" with a "Key Task" of "physically segregating 'firearms on [Brittingham's] personal FFL' from those acquired by AAC." SA25. That task was assigned to Thompson and given an expected completion date two weeks later. SA25–26. Mustian never heard from Thompson that the job could not be done, and assumed it had been completed. SA26. Similarly, Mustian provided guidance to other AAC employees when they asked. For instance, in the spring of 2010, Mustian advised AAC employee Ethan

11

Lessard not to touch firearms owned by Brittingham, because "anyone who touches them (NFA's) without Kevin in the room would be taking possession of a firearm unlawfully." SA28, n.31. Mustian confirmed that Lessard "may not come into possession without Kevin being present of the firearms that Kevin owns personally." *Id.* And although the process took several months longer than anticipated, Mustian secured a new FFL for AAC at its Norcross plant. SA21, 27.

Mustian also provided advice and guidance regarding the need for Brittingham to terminate his old FFLs to ease the transfer of machine guns to the new AAC. JA338–39, 1009, 1033; *see also* 27 C.F.R. §479.105(f) (permitting law enforcement letters to issue allowing transfers of machine guns when the original FFL is going out of business). Brittingham never responded to Mustian's request for permission to work with an AAC employee on that process. JA339.

On the ground at Norcross, relatively little was accomplished regarding compliance. SA21. From two states away, however, Mustian believed that AAC was not "out of sync with the applicable regulatory framework" so long as Brittingham remained on site and exercised dominion and control over the firearms he still owned or that remained on his FFLs. SA31–33.

### 7.     AAC's move to Lawrenceville and Changes at FGI

In July 2010, AAC moved its entire operation to a new facility in Lawrenceville, Georgia. SA21. At the time, Brittingham was the president of AAC, a "responsible person" for all FFLs, and the owner of many of the firearms. Yet Brittingham testified that he took no role in "moving anything from Norcross to Lawrenceville" and that he had "never seen" any paperwork itemizing the move. JA118. In fact, during the move Brittingham was on vacation at the beach. *Id.* In Brittingham's absence, employees did not move his machine guns to Lawrenceville, because no law enforcement letters had been received for them. JA305.

After the move, Mustian secured a new FFL for the Lawrenceville location. SA21. AAC then implemented a new system for its new bound book. SA31. If working correctly, the new system would "automatically generate bound book entries" for manufactured and outgoing silencers. *Id.* Although AAC employees knew that the new FFL should become the "default," technical issues arose with the program. Thus the new FFL never "became the default FFL for all purposes," and the issues persisted. *Id.*

Meanwhile, the fall of 2010 brought changes at FGI. Chief Executive Ted Torbeck, who had been relatively friendly to the unique culture of AAC, departed, followed by Chief Operating Officer Joe Gross. SA35–36. Robert

Nardelli took over the leadership role at FGI.  SA35.  By comparison to his predecessor, Nardelli was more traditional, brought in to try to "turn ... around" difficult financial times at FGI.  SA36, JA123–24.  Neither Schauble nor Brittingham expected the new head of FGI to "be a fan of us or the military business."  JA124.  Still, changing management and priorities were within FGI's prerogative; nothing in any agreement gave Brittingham the power to block such a change.

        8.     *Brittingham's and Thompson's Suspension and Terms of Return*

In December 2010, Brittingham and Thompson were suspended with pay.  Brittingham had received an unregistered antique silencer from a collector and kept the silencer on AAC's premises.  When FGI's compliance officer Roger Mustian learned that the illegal, unregistered silencer was at AAC, he arranged for the company to give it to a museum.  JA339.  Rather than do so, Brittingham destroyed the silencer and mailed off dozens of its pieces to Mustian.[1]  JA191.  Mustian and Fred Roth, the general counsel of FGI, traveled to AAC's office to investigate the incident.  In Brittingham's office, they discovered a loaded Mossberg shotgun (from Old AAC's FFL),

---

[1] Because the district court found this incident "not particularly relevant," JA86, little in the record reflects why Thompson was also suspended thereafter.

as well as a bottle of tequila. SA37 n.41; JA401, 191. In responding to these issues, Brittingham was "evasive." JA353, 401.

During the suspension, Schauble worked to get Brittingham and Thompson reinstated. Schauble emailed new CEO Nardelli and others at to describe their importance to research and development as well as marketing for AAC, and to encourage expediting the investigation of the silencer incident. JA862. Schauble also ghostwrote an email apology for Brittingham to send to Nardelli. SA39. Also during the suspension, Schauble oversaw an AAC effort to segregate Brittingham's firearms and remove them from Lawrenceville. Schauble testified that Brittingham "desired to have all of his guns back, and also we desired, from a company perspective, to segregate the firearms on site. So we took all his firearms and he came and got them." JA353. In late December, Schauble emailed Mustian to confirm that "[a]ll KB's personal firearms are now off premises—the only firearms on premises are those owned by AAC/Remington." JA1010.

Some FGI officials, including Nardelli, thought Brittingham should have been terminated over the silencer incidents, but the Company ultimately decided to give him a second chance. On January 9, 2011, Brittingham and Thompson received an offer to return to work.

Reinstatement involved salary cuts and a year-long period of probation during which any further violation of compliance policies would result in termination. SA42. Brittingham's title changed from president to "founder," and he was removed as a "responsible person" from new AAC's licenses. JA401. Brittingham and Thompson returned to work.

Still, Brittingham "consistently refused to execute" his amended employment agreement. SA43. Brittingham knew that, given the mixing of firearms at AAC, he was already in violation of the law. SA43, n.44. He emailed Melissa Cofield, FGI's head of human resources, in February 2011 to disclaim the amended agreement because of the "current illegal possession of machine guns situation." JA885. After receiving assurance from human resources, Brittingham oddly scribbled "flounder" as his signature. SA43. (Brittingham denied signing "flounder" at trial, JA198–99, which the court found "lacking credibility." SA43.)

9.    *Misconduct after Brittingham's Suspension*

Even after he returned from suspension, Brittingham continued to flout the law and FGI's policies. For example, he submitted for company reimbursement a $3,000 bill from a strip club. In an email to Schauble, Brittingham explained that "AAC's best customer [military] ... requested that I take them to a club. I did that." JA1025. In response, Schauble

16

pointed out that this was "in violation of every [federal regulation] governing interaction between government entities and industry." JA1023–24. At trial, Brittingham testified that although he was at the strip club, and did spend $3,000, none of that money paid for government employees. JA206. Instead, Brittingham said (incredibly) that he spent the entire $3,000 on beers for one AAC employee and roughly 100 lap dances for himself and that employee. *Id*.

About a month after returning from suspension, Brittingham continued to antagonize FGI's compliance leaders. Brittingham emailed Mustian: "Thanks for all the help from you and [Roth] throughout this difficult process. You guys are a real treat ... it's amazing you both have not been promoted within the last couple months." SA51 (noting the sarcasm).

As the difficulties continued, Schauble consulted FGI's head of human resources Melissa Cofield about potentially terminating Brittingham. SA52. They agreed that sufficient grounds for termination were lacking, but they were upset with Brittingham for his behavior, which Schauble considered "inappropriate for his role." SA52.

10. *Efforts to Hire Compliance Personnel*

When Brittingham and Thompson returned from suspension, FGI's counsel recommended hiring a compliance specialist for AAC. SA45. That

17

month, AAC hired Jerry Jackson as a combined compliance/human resources person.  She stayed only a few weeks and left for unknown reasons.  SA46, n.48.

AAC replaced her with John Stevens, a retired FBI agent.  SA47. Stevens had a lengthy career in criminal investigations and compliance with regulatory schemes, as well as contacts in the Atlanta Alcohol Tobacco & Firearms office.  JA373.  Stevens was new to firearms compliance and thus started his tenure by attending a four-day training with FGI's outside ATF counsel.  SA47.  The testimony at trial showed that it was "difficult" to find qualified compliance experts in the "rather small" industry.  JA339, 357.

11.    *Machine Guns at AAC*

During the summer of 2011, machine guns, a grenade launcher, and other firearms owned by Brittingham once again returned to AAC. Brittingham's research and development department was working on a major government contract called "family of muzzle breaks and sound suppressors."  JA290.  As part of that project, belt-fed machine guns—the ones on Brittingham's old FFL, which had never been transferred to AAC— were needed for testing.  *Id.*  Ethan Lessard, an AAC employee who had never worked for Brittingham pre-acquisition, routinely transported these machine guns, the grenade launcher, and other weapons to Lawrenceville.

18

SA63, n.64; JA306.  Brittingham did not countermand this practice, nor did he retrieve the weapons himself, nor did he maintain dominion and control by securing the firearms at night.  JA324, 294.  Under Brittingham's leadership, the research and development department made no effort to log those machine guns into or out of AAC's bound book or the vault in particular.  SA34; JA306.

12. *Photo Shoot and the Knox Williams List*

On October 7, 2011, AAC hosted a photo shoot, featuring guns and silencers owned by Brittingham.  SA57; JA159.  At trial, Brittingham "testified that he was unsure whether certain guns were his, whether they were operable, or how they would have gotten to AAC."  SA57.  The district court found that twenty-one pages of Brittingham's testimony "lacked credibility," concluding that "many of the guns used in the photo shoot were in fact Brittingham's."  SA57.

Days after the photo shoot, compliance specialist Stevens arrived at AAC and found "the guns ... still laying around."  SA58; JA375.  Working with AAC employee Knox Williams, Stevens instructed that all guns be laid out on the floor and their serial numbers recorded, effectively for an audit.  Williams compiled a handwritten list aiming to identify each firearm and its rightful owner.  SA58.  The Knox Williams list eventually included 69

firearms.  JA887–89.  Brittingham conceded that many of these were his; they were listed as "excluded assets" from the original acquisition of AAC or appeared on his old bound books.  SA59.

To be sure, the Knox Williams list did not accomplish its intended goal—to determine the rightful *owner* of every loose firearm at AAC on October 18, 2011.  SA61.  Some may have come from Remington; others may have been owned by AAC but not recorded on their (malfunctioning) bound book system.  SA62–63.  Thus, as a tool for determining ownership, the list was "inaccurate and unreliable."  SA65.  But there is no dispute that the serial numbers were accurate—and thus, the list *did* reflect firearms present at AAC on that date, eleven days after the photo shoot.  Among those were some of Brittingham's machine guns and a grenade launcher.

For instance, an HK machine gun, serial number 88-001692, appeared on the list as present at AAC in mid-October 2011.  JA888.  It also appeared on the list of assets "excluded" from the initial acquisition.  JA781, JA217.  AAC employee Lessard confirmed that he brought that machine gun to AAC for research and development.  JA316.  Similarly, an M249 Squad Automatic Weapon, serial number SAW003, was at AAC in October 2011 and recorded on the Knox Williams list.  JA887.  Although AAC had purchased that machine gun, there was no record of lawful transfer from

Brittingham's sole proprietorship FFL. JA221–22. Lessard brought that machine gun to AAC also, JA310, and Williams testified that it had been used at the photo shoot. JA158.

Likewise, a 40 millimeter grenade launcher, serial number 157-000285, appears on the Knox Williams list. JA887. Lessard brought this grenade launcher to a silencer show in Memphis in June 2011, threw it in the back of a truck after the show, and then "dumped" it on the AAC floor upon returning to Lawrenceville. JA310–11, 327. It remained at AAC three months later when Williams made his list in October 2011. All the while, this grenade launcher was registered to Brittingham's sole proprietorship FFL and was never lawfully transferred to AAC. JA1077.

The Knox Williams list sent a clear message to Schauble and FGI: that it would be impossible for AAC to comply with the law with Brittingham in charge. Schauble testified that in late November 2011, "I spoke to my boss and I said, you know, we've been able to tolerate a certain amount of activity that I thought was detrimental to the business, but this kind of activity can put us all in jail, and I don't think we should tolerate it any longer." JA360. Schauble commented, "I was the [responsible person] on that license. If the ATF came in at any given time to that facility, they would have found guns on the premises that weren't supposed to be there ...

21

and I did not feel that my repeated attempts to tell him that was unacceptable were getting through." JA361. The decision was therefore made to terminate Brittingham for cause.

### 13. *Brittingham's Termination*

The night before he was fired, after being tipped off, Brittingham "went to AAC and removed some personal items (and possibly one machine gun)." SA69. After entering the facility, Brittingham "turned a video security camera downwards so that it would not be able to record images of what he was removing." SA69. During the same hour Brittingham admitted doing this, he exchanged 21 text messages with Thompson. JA1048–74. Those text messages were never produced. SA69, n.67.

On the morning of December 21, 2011, AAC terminated Brittingham. His termination letter identifies violations of law, company policy, and his probation as grounds for termination. JA905. Within hours, AAC promoted employee Cory Weisnicht to a full-time compliance position. SA70. Weisnicht testified that previously, he had thought there was no "point for me to step into a compliance role" with Brittingham still at AAC. JA418–19 (adding that Brittingham's "firearms being in the building" were a problem, and he thought it would have been "kind of a struggle" to make the company's founder obey him on compliance).

22

*14.    Thompson's Termination*

After terminating Brittingham, AAC immediately began an internal investigation, both to prepare for inevitable litigation and to address remaining firearms of Brittingham's on the premises. JA406, 492. As part of the investigation, AAC's outside counsel traveled to Georgia to meet with Thompson. SA72. With the agreement of counsel, Thompson made an audiotape of the meeting. At the time, she stated that she would provide a copy to AAC. SA72. Thompson later refused to do so. SA72; JA247, 268.

Concerned about this, AAC alerted its sole Board member, Steven Jackson, of the problem. JA391–92. Jackson received a recommendation that Thompson be terminated for failing to cooperate in a company investigation. He accepted the recommendation. SA73.

Soon after, a human resources manager met with Thompson at AAC. Thompson was told that "by not turning the tape over, you are not cooperating with the investigation and that is grounds for termination." JA931. Thompson then "asked if that was the part in her [employment] agreement about cooperating with investigations, and I told her 'yes.'" *Id.* (human resources manager's notes). Further, the termination letter itself, handed to Thompson on the spot, prominently stated that she had "refused to

23

cooperate in company investigations," specifically including refusing to share the tape.  JA934.

    15.    *Lawsuit, Trial, and Judgment*

In September 2012, Brittingham and Thompson sued Remington and AAC.  JA43.  They claimed breach of their employment contracts and sought to void their restrictive covenants.[2]  Brittingham also claimed a breach of the implied covenant of good faith and fair dealing and sought contractual attorney's fees, costs, and expenses.  *Id.*  Brittingham and Thompson filed suit in the Southern District of New York, an agreed venue given that by contract, substantive New York law applied.

In June 2013, the parties held a seven-day bench trial before the Honorable Judge Katherine B. Forrest.  In January 2014, Judge Forrest issued an opinion finding in favor of the plaintiffs on all claims and awarding significant damages.  *See* SA1.

    The district court's opinion reflects its view that the parties' agreements were a bad deal for Brittingham—that he would have been better off if he had never sold his company.  SA4, 7, 9–10 ("it was not a deal structured with the personality and business realities properly balanced, all things considered").  The court saw Brittingham as a victim, whose little

---

[2] The court ultimately allowed some of the covenants to stand.

24

company was "swallowed by a large, corporate animal with a dyspeptic digestive tract." SA7. But it is undisputed that Brittingham was an experienced businessman, specifically aware of the risks, SA7, who with the advice of sophisticated legal counsel, accepted an eight-figure up-front payday for selling his company and agreeing to become a corporate employee. JA138.

The district court also devoted a significant portion of its opinion to an irrelevant issue: whether Remington and FGI were negligent in their efforts to promote compliance at AAC. For example, the court found that FGI's Mustian "did essentially nothing to effect the transfer of the firearms" between FFLs or AAC locations. SA21; *see also* SA23–24 (FGI was "complacent as confusion reigned AAC's compliance efforts"); SA35 ("Remington bears responsibility" for the failure of compliance at AAC). Notably, this lawsuit does not (and could not) present any claim against Remington and FGI for negligence in respect to compliance at AAC. The question is whether Brittingham's *own* failures in respect to compliance gave AAC "cause" for termination.

In two later orders, the district court retrenched. Calling language from its initial opinion "overly broad," the court limited Brittingham and Thompson's salary award to one year each, and upheld some of the

restrictive covenants. SA 119 n.2. Later, the court granted reconsideration to Remington on another point, deciding that no prejudgment interest was proper on the $8 million payment, since it would not have been due until 2015 anyway. SA124.

The district court then found that Brittingham's contract called for fee-shifting. SA131. In all, the court entered judgment in favor of Brittingham and his old company for $250,000 in salary with prejudgment interest, plus $8 million, plus roughly $1.6 million in attorney's fees, plus roughly $137,000 in expenses; and in favor of Thompson, for $100,000 in salary with prejudgment interest; and invalidated some of the restrictive covenants against them. SA144.

## SUMMARY OF ARGUMENT

I. The district court erred in concluding that Brittingham's failure to comply with federal firearms laws was not "material" and thus did not constitute "cause" for termination. JA795, §3.2(a)(v)(B) ("material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations"). Brittingham was the head of AAC. He owned (either directly or through his sole proprietorship) numerous machine guns that AAC employees feloniously transported and feloniously possessed without his dominion and control. *See*

26

18 U.S.C. §922(o); 26 U.S.C. §5861. Brittingham was the legally "responsible person" for the FFLs (his own) that listed those machine guns. He was the immediate supervisor of the AAC department where those crimes occurred. And he was specifically aware of the legal requirements and the fact that they were being violated.

Under those circumstances, the district court erred by finding that Brittingham's legal violations were not "material." These were felonies, not regulatory minutiae. And the fact that FGI and Remington made some missteps in their efforts to assist with compliance at AAC certainly does not make Brittingham's violations "immaterial." Indeed, it would be a very odd and dangerous result to say that an employer struggling to improve compliance in a manufacturing plant is precluded by its own struggles from terminating for "cause" an executive who bred a culture of noncompliance and showed an utter lack of respect for the law.

Further, terminating Brittingham for breaking the law did not require action by the AAC Board of Directors. Only Clause (F), not Clause (B), required the AAC Board to "reasonably determine" whether cause existed before terminating Brittingham. The district court erred as a matter of law by attributing part of Clause (F) to the other provisions—a finding not sought by either party.

II.     The district court also erred in concluding that Lynsey Thompson could not be terminated for her failure to cooperate with an investigation.  JA806, §3.2(a)(v)(F) ("Cause" to terminate includes "the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors").

The court's ruling was apparently based on the incorrect assumption that AAC needed to give Thompson "written notice and opportunity to cure" before terminating her under Clause (F).  SA103.  Yet as the parties agreed, "written notice and opportunity to cure" is not required under Clause (F).

Further, the district court erred by finding that the AAC Board of Directors' "acquiesce[nce]" in a "recommendation" to terminate Thompson was somehow insufficient to show a "reasonabl[e] determin[ation]" by the Board under Clause (F).  SA73.  As the district court itself acknowledged, it is "common board practice" for board decisions to be based on management's recommendations.  JA442.

III.     Brittingham's claims for breach of the implied covenant of good faith and fair dealing should never have proceeded to trial.  New York law bars bad faith claims that parallel breach of contract claims—in particular when those claims are "intrinsically tied to the [same] damages."

28

*Deer Park Enters., LLC v. Ail Sys.,* 57 A.D.3d 711, 712 (N.Y. App. Div. 2008). Brittingham requested identical damages—his alleged contract damages of $8 million—for both sets of claims. JA67–70.

Alternatively, the district court clearly erred by finding bad faith. Remington and FGI would never have intentionally undermined compliance at AAC. Indeed, doing so would only cost Remington financially and place its executives in criminal jeopardy. And it is not bad faith to take steps to fire a noncompliant employee after realizing that his activity "can put us all in jail." JA360. Moreover, although the district court clearly believed that the structure of the acquisition set up the nonconformist Brittingham to fail, Brittingham himself agreed to that structure, with the advice of sophisticated counsel. He did not negotiate for contractual assurances that management would never change its approach to compliance, that FGI would bear sole responsibility for compliance, or that he would be able to operate new AAC in whatever manner he saw fit. It is not "bad faith" to hold Brittingham to the terms of the contract he signed.

IV.    The district court erred by awarding Brittingham nearly $1.6 million in attorney's fees under the indemnification provision of the Asset Purchase Agreement. New York law requires contractual fee-shifting provisions to be "unmistakably clear." *Hooper Assocs. Ltd. v. AGS*

29

*Computers*, 548 N.E.2d 903, 905 (N.Y. 1989). The language of the indemnification provision here is indistinguishable from the provisions found *insufficient* to shift fees in *Hooper* and in *Coastal Power Int'l Ltd v. Transcontinental Capital Corp.*, 182 F.3d 163, 164 (2d Cir. 1999). Further, the indemnity provision specifically bars recovery of "special damages," which includes attorney's fees. It is far from "unmistakably clear" that the contract here reverses the American rule in favor of the English model.

## ARGUMENT

### I. AAC did not breach Brittingham's employment agreement by firing him for breaking the law.

As the district court correctly recognized, "At its core, this is a breach of contract case. The central claim ... is Brittingham's claim that defendants terminated him without Cause." SA74. The contractual grounds for a "for cause" termination specifically included "material failure" to comply with the law. SA16. By the end of trial, it was perfectly clear that there had been repeated violations of the law under Brittingham's supervision, with respect to firearms that Brittingham (or his sole proprietorship) owned and for which he was legally responsible. SA81–82.

Still, the district court held that Brittingham's termination was a breach of his contract—a holding that reflects two fundamental errors of law. First, the district court wrongly concluded that the violations were not

"material." Second, the court misread the employment agreement as holding that the termination required specific approval of the AAC Board. In light of these errors, the court's decision on the contract claim must be reversed.

> **1. AAC had cause to fire Brittingham because he and his subordinates committed multiple felony violations of federal firearms laws with Brittingham's weapons.**

>> **a. Brittingham committed, caused, and allowed rampant violations of federal firearms laws.**

Under 26 U.S.C. §5861(d), it is illegal "for any person ... to receive or possess a firearm not registered to him in the National Firearms Registration and Transfer Record." Violating §5861(d) is a felony punishable by ten years in prison. 26 U.S.C. §5871. Similarly, under 18 U.S.C. §923(g)(1)(A), FFL holders must maintain accurate records, called "bound books," for firearms at their business. Willful violation of that requirement is a felony that carries up to a five-year prison term. 18 U.S.C. §924(a)(1)(D). ATF Ruling 2010-1 provides an official agency interpretation applying §923(g)(1)(A). ATF Ruling 2010-1, at 2 ("a 'transfer' includes any change in dominion or control of a firearm, whether temporary or permanent"); *id.* at 3 (holding that any transfer to a non-employee of the FFL requires the FFL to "contact NICS for a background check, record a disposition entry, [and] complete an ATF Form 4473.").

In short, the ATF should be able to appear at any moment, at any FFL's premises, and account for every single firearm. ATF should be able to start with the bound book and physically locate every firearm listed in it. At the same time, ATF should be able to collect every firearm physically present and find it in the bound book. *E.g.*, 18 U.S.C. §923(g)(1)(B) (allowing the Attorney General to inspect "the inventory and records" of any licensee without reasonable cause or a warrant).

Compliance with these laws is a critical aspect of any firearm manufacturer's business—and it was particularly important for AAC. By the summer of 2010, AAC had two locations and a separate FFL for each. At the same time, Brittingham's two older FFLs still contained numerous silencers, a grenade launcher, and machine guns, including some he had specifically declined to sell to AAC, and others he had agreed to sell but failed to transfer. Machine guns, in particular, were subject to stringent transfer requirements; essentially, they could not be transferred at all without individualized law enforcement approval. 18 U.S.C. §922(o). Thus, once AAC moved to Lawrenceville, AAC's use of machine guns and grenade launchers from Brittingham's old FFLs required a level of professionalism and care to avoid violating the law.

Brittingham himself clearly understood these requirements—but he consistently disregarded them. At trial, Brittingham explained how to legally transfer a post-1986 machine gun. JA117, 182, 111 (Brittingham explaining that FFL holders must record incoming and outgoing firearms in their bound books, and what information needed to be recorded); JA110–11 (Brittingham stating that he was "obligated to maintain" his old FFLs, and acknowledging that his old FFLs "house the machine gun collection"). Still, the evidence at trial showed that Brittingham refused to respect these legal requirements and repeatedly violated them himself—or allowed AAC employees to violate them.[3]

*First*, Brittingham allowed other personnel to deliver machine guns and a grenade launcher from his sole proprietorship to the AAC facility at Lawrenceville—when the law required him to do this himself. JA353. Most of the deliveries were made by Ethan Lessard, an AAC employee who had no affiliation with either of Brittingham's FFLs. As the district court found, "Lessard testified credibly that he transported most if not all of the firearms used for development work at AAC from Old-AAC Norcross facility to AAC's facility in Lawrenceville." SA63, n.64. JA306 ("Q. What portion of

---

[3] At trial, Remington presented additional examples of legal violations by Brittingham—as well as other sufficient grounds for his termination. For purposes of this appeal, however, the violations discussed in this brief are more than sufficient to require reversing the judgment.

the belt-fed machine guns did you use in the R&D department in Lawrenceville in 2011 were you responsible for bringing over? A. Almost all of them."). Critically, Lessard transported the firearms alone, without Brittingham present. JA323 ("Q. Mr. Brittingham was not with you? A. No, sir.").

By allowing an individual with no connection to the old FFL to make these deliveries alone, Brittingham repeatedly caused an unlawful "transfer" of NFA firearms to occur. 26 U.S.C. §5861(j) (defining "transfer"); ATF Ruling 2010-1 at 2 ("A 'transfer' includes any change in dominion or control of a firearm, whether temporary or permanent .... A change in dominion or control may occur even when such change does not convey title to the firearm."); JA334. Transfer of the machine guns in this case without specific, individual authorization from law enforcement is illegal. 18 U.S.C. §922(o). Similarly, knowing possession of that machine gun, without law enforcement authorization, by the new AAC employee also constitutes two felonies, each carrying up to ten years in prison. 26 U.S.C. §5861(d), §5871; *see also* 18 U.S.C. §922(o), §924(a)(2).

*Second*, Brittingham did not maintain the necessary dominion and control over the non-AAC machine guns and grenade launcher once they arrived at Lawrenceville. Exercising "domination and control" would have

34

been as simple as Brittingham's being on-site during the day. JA353. At night, he could either remove each firearm or lock it up so that it was accessible only to him. *Id*. As Lessard testified, Brittingham did *not* stay overnight with the firearms left on the work bench, did *not* return the firearms to Norcross, and did *not* "take those firearms at night and lock them up." JA324; *see also* JA294 (AAC employee Smith confirming that before Brittingham's termination, guns stayed out of the vault in the department overnight); JA295 (Smith explaining that he kept a machine gun in his desk, unlocked, and that Brittingham brought it to him in late 2011).

The problems presented by this conduct were widely known among Brittingham's staff. As employee Lessard testified, "the 240 is a 30-pound machine gun, it's four feet long, you can't hide it." JA307 (confirming he had brought the 240 to Lawrenceville). Even Lessard himself understood that, as a machine gun, the 240 could not be properly transferred to the Lawrenceville FFL without a special law enforcement letter. JA307, 1076 (showing the 240 machine gun on Brittingham's sole proprietorship FFL).

*Third*, Brittingham failed to record the guns' outgoing "visits" to AAC in his own bound book—the book for his sole proprietorship FFL. 18 U.S.C. §923(g)(1)(A) ("Each licensed … manufacturer … shall maintain such records of importation, production, shipment, receipt, sale, or other

35

disposition of firearms at his place of business."). SA19. And when the guns for which he was responsible arrived at AAC, he failed to ensure that their visit to AAC was recorded in *its* bound book. *Id.* The 240 machine gun, for example, exists as serial number FN 93932 on Brittingham's sole proprietorship FFL, which shows no record of the gun ever traveling to Lawrenceville. JA1076. Although Lessard transported the gun to Lawrenceville, he acknowledged that he made no effort to make any such record—either for that gun or for the many others he transported. JA306.

This constitutes a failure *by Brittingham himself*—Lessard's boss and a responsible person for both his sole proprietorship FFL and the new AAC FFL (at least until his suspension)—to "maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms [as the regulations prescribe]." 18 U.S.C. §923(g)(1)(A). Indeed, Brittingham's personal lack of regard for the legal requirements set the tone for his entire operation at AAC; as the district court found, "AAC employees would take various guns in and out of the gun vault, without logging them, 40 or 50 times per day." SA34.

The district court erred as a matter of law in finding no violation of the bound book law. SA96; 18 U.S.C. §923(g)(1)(A); 27 C.F.R. §478.123. The court held that, because the regulation requires only that bound book

entries reflecting moved firearms be filled out "by the seventh day" after the transfer, firearms need not be entered at all if they happened to stay at Lawrenceville for fewer than seven consecutive days. *Id*.; SA96. This misinterprets that regulation. The regulation provides a 7-day grace period for updating bound books to make them match required registrations and government records. It is not an authorization for highly regulated firearms such as machine guns to vacation for up to a week at a time with no record of where they went and with whom. Such an interpretation would leave a gaping hole in otherwise exhaustive recordkeeping requirements.

Brittingham has not denied that serious federal firearms violations occurred at AAC. His post-trial brief states: "AAC unlawfully possessed thousands of firearms not registered to it over a period of two years." Pltfs' Post-Trial Br., No. 1:12–cv–6792, Doc. 171 at 89 (Aug. 2, 2013). Further, Brittingham understood contemporaneously that the violations were happening. In February 2011, for example, Brittingham specifically noted "the current illegal possession of machine guns situation" in an email to FGI's head of human resources, Melissa Cofield. SA43; JA885.

The district court too came to the conclusion that AAC was not in compliance with federal firearms laws. The court stated that "under Remington's ownership, the number of silencers and other firearms that

came in and out of the Lawrenceville facility without proper identification and bound book entries was significant." SA81–82.

### b. The district court erred in holding that the violations were not "material."

Despite all of this evidence, the district court still held that Brittingham's termination breached his employment agreement. It believed that any legal violations were not "material" under clause (B). SA81–83; 93–95. That error is reviewed *de novo*. *Carco Grp., Inc. v. Maconachy*, 718 F.3d 72, 79 (2d Cir. 2013).

The violations here involved serious felonies. Improper transfer of NFA weapons such as the grenade launcher and machine guns violated 26 U.S.C. §5861(d), a serious and heavily-policed offense carrying up to a ten-year prison sentence. §5871. The ATF expert testified that "NFA firearms have as close to zero tolerance with ATF as anything does. They must be right. Firearms that are not registered to the possessor are subject to seizure." JA424 (describing ATF's revocation of some 75 FFLs based on improper records for NFA firearms such as machine guns). The district court here is the first court of which Remington is aware to find that repeatedly violating a felony statute carrying a ten-year prison term is not a "material" violation of the law. *See* 26 U.S.C. §5861(d).

Courts, as well, have interpreted §5861(d) strictly.  *See, e.g., United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984) (defendants' possession of machine guns not registered to them for roughly sixty seconds in their car was unlawful "possession" under §5861(d));  *United States v. Tarrant*, 460 F.2d 701, 704 (5th Cir. 1972) ("Congress intended the possession of five firearms to constitute five separate offenses" under §5861(d)).

Here, violations of §5861(d) occurred repeatedly, within Brittingham's own department, using machine guns and a grenade launcher for which he was undeniably a "responsible person."  It is difficult to imagine what *would* be considered a "material failure to comply with applicable laws and regulations with respect to the Company's operations" if these crimes are not.

The district court also erred in concluding that these violations could not be "material" in light of other violations within AAC—and in light of FGI and Remington's own supposed failure to do more to improve compliance.  *E.g.*, SA35, 94–95.  But  regardless, Brittingham's contract still provided that he could be terminated for "cause" based on his *own* "material failure" to comply with the law.  It cannot possibly be that the company's struggles with compliance should make it more difficult for it to do the single thing that would have the greatest impact:  terminate the division's

leader based on his persistent disregard for the law. Under that perverse standard, the worse off a company is compliance-wise, the less appropriate it is to terminate its leadership for failing to comply with law. It does not make sense that the company's founder and head of R&D could not be fired for rampant violations in his own department because the company—really his company—may have had other issues as well.

Brittingham cannot deny that machine guns and other NFA firearms for which he was a "responsible person" littered the research and development office he supervised—day and night, consistently unsecured. JA885. Nor can he deny that his direct subordinate Ethan Lessard feloniously transported those machine guns from place to place. Brittingham's boss at FGI worried that these violations "could put us all in jail." JA360. The district court acknowledged that such concerns were relevant to whether Brittingham could be fired for cause. SA83, n.76 ("such a legal analysis at that time could have been relevant to whether a determination of 'material' was reasonable"). These violations were plainly "material," and the district court erred in holding otherwise.

### 2. Brittingham's employment agreement did not require action by the AAC Board of Directors before he could be fired for breaking the law.

The district court also erred by ruling that termination for cause under §3.2(a)(v)(B) had to be "reasonably determined by the Board of Directors of the Company." §3.2(a)(v)(F). SA17, 78. The contract says otherwise. This is a question of contract interpretation, reviewed *de novo*. *Carco Grp.*, 718 F.3d at 79. The district court interpreted these provisions in way neither party had asked it to, contrary to grammatical principles, and in a way that would turn at least one other subpart into nonsense.

Mr. Brittingham's employment agreement states:

> For purposes of this Agreement, the term "Cause" shall mean:
> (A) if the Executive is indicted (which indictment is not dismissed within sixty (60) days and in the reasonable good-faith determination of the Board of Directors of the Company Executive has committed the actions alleged in the indictment), convicted of, or pleads guilty or no contest to, a felony or any crime involving moral turpitude, dishonesty or theft; (B) material failure by the Executive to comply with applicable laws or governmental regulations with respect to the Company's operations or the performance of her duties; (C) actions by the Executive involving embezzlement, theft, sexual harassment, discrimination, fraud or other acts of a criminal nature by the executive in her dealings with the Company or its employees or representatives; (D) the Executive's continued failure to perform her substantial job functions within thirty (30) days following written notice from the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period; (E) the Executive's material violation of any written policy of the Company within thirty (30) days following written notice from

41

the Company of the occurrence of any such failure, if such failure is not cured within such thirty (30) day period; or (F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, *in each case as reasonably determined by the Board of Directors of the Company*. Upon such termination for Cause, the only obligation the Company will have under this Agreement will be to pay the Executive's unpaid base salary accrued through the date of termination. [Emphasis added]. JA795, §3.2(a)(v).

The district court held that the phrase we have italicized applies not only to clause (F) (where it appears) but to clause (B) as well—and thus that it required a "reasonabl[eness] determin[ation]" by the Board before Brittingham could be fired for violating the law. SA78 n.71 The district court misread the contract.

As a threshold matter, the district court interpreted the contract in a way no party had asked it to—a clear sign that the court read the language in a way no party ever intended it to apply. All parties understood that the requirement that the Board "reasonably determine" cause for termination applied only to clause (F), appearing after and as part of that clause alone. For instance, in post-trial briefing, the plaintiffs laid out their view of the elements necessary for firing Brittingham and Thompson under clauses (B), (E), and (F). Pltfs' Post-Trial Br., Doc. 171 at 81, 84, 113, 118. Plaintiffs' account of clause (F) includes the Board's reasonable determination as an element; their own account of clauses (B) and (E) does not. *Compare id.* at

118 *with* 113, 81, 84.  No one other than the district court believed that termination under clause (B) required any particular action by the Board.[4]

Further, grammar rules reflect that the phrase "in each case as reasonably determined by the Board" modifies only clause (F).  Each clause ends with a semicolon.  Phrases offset only by a comma, thus, are part of their home clause, and do not modify the other clauses.  *U.S. ex rel. Palermo v. Smith*, 17 F.2d 534, 535 (2d Cir. 1927) ("punctuation by semicolon is indicative of a complete thought in one clause separate from the other clauses of the statute").  For instance, the phrase "if such failure is not cured within such thirty … day period" at the end of clause (D) obviously modifies only clause (D).  Likewise, the most natural reading of the "reasonably determined" language—located within clause (F), which is offset from the other clauses by a semicolon—is that it applies only to clause (F).

Moreover, it would not make sense for "in each case as reasonably determined by the Board" to apply to every clause.  Clause (A), for instance, itself already mentions the Board.  Clause (A) permits the termination of an indicted executive if the Board makes a "good faith determination" that he "has committed the actions alleged."  JA795, §3.2(a)(v)(A).  And clause (A) also permits termination if an executive pleads guilty to a felony, among

---

[4] Because no party claimed that the Board needed to determine whether to fire Brittingham, no evidence was presented about whether that happened.

other possibilities.  It would make no sense to have the Board "reasonably determine" that it made a "good faith determination" or to require the Board to "reasonably determine" a simple factual issue such as whether someone pleaded guilty to a felony.  Thus, layering on "as reasonably determined by the Board" would make hash of clause (A).  And given that "as reasonably determined by the Board" cannot coherently apply to clause (A), there is no way to justify applying it to clause (B) either.

Finally, "reasonably determined by the Board" fits naturally into clause (F).  The entire clause reads: "(F) the Executive's failure to fully cooperate in any investigation or audit of the Company or its affiliates, in each case as reasonably determined by the Board of Directors of the Company."  §3.2(a)(v)(F).  "In each case," thus refers to "any investigation or audit" and to whether, in that instance, the executive had "fully cooperated."  The phrase thus makes logical sense without needing referents beyond clause (F).  In this respect as well, the district court erred.

## II. AAC did not breach Ms. Thompson's employment agreement by terminating her for failing to fully cooperate in an investigation.

The district court also erred as a matter of law in concluding that AAC lacked "cause" to terminate Lynsey Thompson.  SA101–04.  AAC fired Thompson for "cause" based on her refusal to provide a recording of her interview with AAC's counsel (among other reasons).  *See* Defts' Summary

44

Judgment Motion, 1:12–cv–6792, Doc. 83 at 28 (Apr. 30, 2013); Defts'

Post-Trial Br., Doc. 170 at 36.  To the extent that it addressed this argument

at all, the district court rejected it simply on the ground that Thompson "was

never provided written notice and an opportunity to cure as contractually

required; and she never waived such right."  SA102.

But "written notice and an opportunity to cure" are not required for

termination for cause under clause (F).  That clause permitted Thompson's

termination based on any "failure to fully cooperate in any investigation or

audit of the Company or its affiliates, in each case as reasonably determined

by the Board of Directors of the Company."  JA806, §3.2(a)(v)(F).  These

requirements were met.  The court's decision on this issue thus reflects a

fatal error of law.

### 1. Thompson's refusal to turn over the recording constituted a failure to "fully cooperate" in an "investigation" for purposes of clause (F).

Shortly after Brittingham's termination, counsel for AAC traveled to

Georgia to interview Thompson.  AAC allowed Thompson to record that

interview with the express understanding that she would give the company a

copy of the tape.  SA72.  She then refused to do so.  JA246, 265–66 ("Q.

You had promised to provide him with a copy of the tape, isn't that correct?

A. Yes... Q.  Now at some point later on you changed your mind, right?  A.

45

Yes, sir."). At a meeting on January 24, 2012, Thompson was told that failing to hand over the tape constituted a refusal to "fully cooperate" with an investigation and was a terminable offense under her contract. JA931; JA598. Thompson stated that she understood but refused again to share the tape. She was then terminated.

The district court's opinion did not question whether the interview was part of an "investigation" or whether Thompson failed to "fully cooperate." Nor is there any doubt about these points. AAC's sole board member, Steven Jackson, testified that the inquiry was a "follow up" to Brittingham's termination "in anticipation that there would be a lawsuit." JA395. As head of human resources Melissa Cofield explained, the interview "was very important because we anticipated that [Brittingham] would bring a lawsuit, so while everything is fresh on everyone's mind, we were having our outside counsel to talk to key individuals." JA406. At the same time, in Cofield's words, AAC needed to "get our hands around and account for the guns and make sure we were following all the regulations." JA492. AAC was "very concerned that ATF was going to come in, and we needed to able to account for all this stuff." *Id.* In both respects, counsel's inquiry into its termination of Brittingham and the status of the guns on AAC's premises constituted an "investigation or audit" at AAC.

46

Thompson was aware of this at the time—and she was specifically advised that failing to turn over the tape would constitute grounds for termination. Contemporaneous notes show that Thompson was told "Lynsey by not turning the tape over, you are not cooperating with the investigation and that is grounds for termination." JA931. Thompson then "asked if that was the part in her [employment] agreement about cooperating with investigations, and I told her 'yes.'" *Id.* Further, the termination letter itself, which management handed to Thompson on the spot, prominently stated that she had "refused to cooperate in company investigations," specifically including refusing to share the tape. JA934.

AAC wanted the tape—at least a copy of it—for several reasons. For one, the tape was the best record of what was said in the interview. Although counsel also took notes, all parties to the interview knew it was being recorded and counsel had no reason at the time to doubt that AAC would receive a copy. JA266. Thus, regardless of counsel's notes, the existence of a perfect record of the interview naturally makes that record a useful part of the investigation. Further, AAC wanted the tape as a show of Thompson's loyalty and good faith. The company was preparing for multi-million dollar litigation against Brittingham. Brittingham and Thompson were "best friends for ten years." JA232. They "built a company together ...

47

[and] talked and primarily texted ... every day for ten years." *Id*. As Cofield described, "for every day that went by, we became more suspicious of: Is she giving something to [Brittingham]? Was there a reason she didn't want to turn that over?" JA413. After all, when Thompson had the tape and AAC did not, the natural concern would be that Thompson would breach the attorney-client privilege protecting her interview with AAC's counsel, would share the tape with Brittingham, and thus would provide Brittingham insight into the company's preparation for litigation and inquiry into its ATF practices. As the district court observed during closing arguments, "what possible legitimate reason could there be not to turn over the tape? That would be the concern for the company." JA444.

In the words of the district court, "full cooperation is if you have got anything related to this investigation, whether it be answers to interview questions or physical materials, we need them." JA444. Thompson had something related to the investigation, but even after a warning that she would be fired for failure to cooperate, she still refused to provide it. This was a sufficient basis for a "cause" termination under the contract.

48

**2. Clause (F) requires no written notice or opportunity to cure—only a "reasonabl[eness] determination" by the Board, which was properly made in this case.**

The district court nonetheless concluded that Thompson had been terminated in violation of her employment agreement—not because "cause" was lacking, but (apparently) because of procedural problems with the termination. These are issues of contract interpretation, subject to *de novo* review. *Carco Grp.*, 718 F.3d at 79. The full extent of the district court's analysis of this issue is a single sentence: "Again, on none of these bases was she provided written notice and an opportunity to cure." SA103.

Although "written notice and an opportunity to cure" were required under clauses (D) and (E), that was not so under clause (F). The *only* procedural requirement for a clause (F) termination was that ACC's board must have "reasonably determine[d]" that Thompson had failed to "fully cooperate" in an investigation. *See* Pltfs' Post-Trial Br., Doc. 171 at 118.

That element too was satisfied here. AAC's board included a single member: Steven Jackson. SA35. At trial, Jackson testified that he viewed failing to provide the tape "as a termination offense." JA389. On questioning from the judge, Jackson confirmed that *before* the meeting in which Thompson was terminated, he had been aware of the plan to give her another chance to share the tape, and if she refused, to terminate her. JA391.

49

Asked whether he had "reasonably determine[d] that Ms. Thompson failed to fully cooperate," Jackson testified: "I believe the AAC board, being myself, was in agreement with that, and so yes, that would be—the answer is yes." JA390.

The district court criticized this evidence, suggesting that Jackson was simply "provided with a recommendation for her termination and he acquiesced." SA73. The district court saw Jackson's agreement with the recommendation as a "rubber stamp," and thought that was insufficient under the contract. SA78, n.71; SA17 n.13.

But here, Jackson's "acquiescing" *was* a Board decision, just the same as rejecting the recommendation would have been. And as the court itself observed during closing statements, "A lot of boards are provided with recommendations and asked to agree or disagree – that's common board practice." JA442. Further, given that a single-member Board made this determination, it would make no sense to require a formal meeting. Indeed, nothing in Thompson's employment agreement entitled her to a board meeting, or minutes, or a resolution. She was entitled only to a "reasonabl[e] determin[ation] by the Board," and Jackson *was* the Board. Her termination was thus in full compliance with the terms of her

employment agreement. This Court should therefore reverse the district court's judgment in her favor on her claim for breach of contract.

## III. The district court erred by allowing Brittingham to maintain his claims for breach of the implied covenant of good faith and fair dealing, and clearly erred by finding bad faith.

As the district court correctly observed, "at its core, this is a breach of contract case." SA74. For that reason, Brittingham's parallel claims for breach of the implied covenant of good faith and fair dealing—for which he sought identical damages to his breach of contract claims—should never have gone to judgment.

Moreover, the district court erred as a factual matter in finding that Remington and AAC acted in "bad faith." On this record, it cannot possibly have been "bad faith" to terminate the leader of a business unit based on rampant legal violations under his supervision, involving machine guns that he owned and was responsible for under federal law.

### 1. The breach of the implied covenant of good faith and fair dealing claims were duplicative of Brittingham's contract claims because they sought identical damages.

The district court erred as a matter of law by allowing Brittingham to maintain claims for breach of the implied covenant of good faith and fair dealing. Brittingham sought identical damages (the same $8 million in contingent contractual payments) for both types of claims. Thus, as a matter

of New York law, no separate claim for breach of the implied covenant could survive. The district court's decision to rule on the merits of the breach of the implied covenant claim was an erroneous conclusion of law, reviewed *de novo*. *LoPresti v. Terwiliger*, 126 F.3d 34, 39 (2d Cir. 1997).

A covenant of good faith and fair dealing is "implied in every contract under New York law." *Kader v. Paper Software, Inc.*, 111 F.3d 337, 342 (2d Cir. 1997). Because the implied covenant is part of the contract, breach of that covenant "is not a tort; rather, it is a contract claim." *Smile Train, Inc. v. Ferris Consulting Corp.*, 986 N.Y.S.2d 473, 474–75 (N.Y. App. Div. 2014). Thus, "as a general rule, the cause of action alleging breach of the implied covenant is duplicative of a cause of action alleging breach of contract." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 205 (S.D.N.Y. 2011).

One aspect of that general rule is that a separate claim for breach of the implied covenant "cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of contract.'" *Deer Park Enters., LLC v. Ail Sys.*, 57 A.D.3d 711, 712 (N.Y. App. Div. 2008) (citation omitted). Following this rule, the court in *ARI & Co., Inc. v. Regent Int'l Corp.* dismissed a bad faith claim "because the damages it seeks to recover are identical to those asserted in the breach of

52

contract claims." 273 F.Supp.2d 518, 523 (S.D.N.Y. 2003). In *ARI*, the "damages requested" for breach of the implied covenant "simply repeat[ed] those requested for the [breach of contract] claims," and sought the same "exact amount." *Id.*

Here, just as in *ARI*, the damages Brittingham sought for breach of the implied covenant were identical to those he sought for the alleged breach of contract. The district court asserted that the implied covenant claims were "separate from [the] breach of contract claim" but simply ignored the identical damages demands.[5] SA104–06. Brittingham's breach of contract claims alleged that AAC "deprived" him of his "right to receive the ... Four Million Dollars [each] in breach of the [Goodwill Agreement and Purchase Agreement] by purporting to terminate Brittingham's employment for Cause when Cause did not exist." JA67, 70. Brittingham then claimed the identical $8 million in damages—in nearly identical language—for alleged breach of the implied covenant under those two agreements. JA68, 71. As a matter of New York law, then, the claim for breach of the implied covenant could not be maintained.

---

[5] The district court appeared to find a breach of the implied covenant of good faith by AAC against Thompson as well. SA105. This can be disregarded, as Thompson never claimed a breach of the implied covenant. JA43–83.

Indeed, the link between the implied covenant and contract claims went beyond the damages. The "breach" for both types of claims was the same—a termination that Brittingham complains took place without "cause." Evaluating the good or bad faith of an employer who has terminated an employee possibly for "cause" is a prejudicial thicket that New York law has long avoided. "The motives which actuate the employer in discharging his employee are wholly immaterial, if a legal ground exists for the discharge." *In re Nagel*, 278 F. 105, 109 (2d Cir. 1921); *Getty v. Roger Williams Silver Co.*, 221 N.Y. 34, 39 (1917) (noting that it did not matter that, before the alleged "cause" arose, the employer had already decided to fire plaintiff without cause, because "[b]ad motive for strict insistence on legal rights ... does not preclude [employer] from justifying its act"); *Kilian v. Ferrous Magnetic Corp.*, 280 N.Y.S. 909, 910 (N.Y. App. Div. 1935) (reversing for a new trial when the employee had been allowed to offer evidence of the employer's motive in firing him; that testimony "cloud[ed] the real issue and prejudice[d] the [employer's] defense"); *Betts v. Univ. of Rochester*, 507 N.Y.S.2d 566, 567 (N.Y. App. Div. 1986) ("defendant's motivation is irrelevant to plaintiff's cause of action for breach of the employment contract"). Here, the district court effectively found Brittingham was fired

in bad faith—which demonstrates the redundancy and inappropriateness of his claims for breach of the implied covenant.

### 2. The district court clearly erred by finding bad faith.

Separate and apart from the error of law, the district court clearly erred by finding bad faith. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

The implied covenant of good faith and fair dealing is an "implied undertaking on the part of each party that he will not *intentionally and purposefully* do anything to prevent the other party from carrying out the agreement." *Kader*, 111 F.3d at 342; SA104. The district court held that "defendants purposefully and intentionally created a situation in which Brittingham was destined to fail," in two ways. SA106. Neither finding is supported by the evidence here.

*First*, there is no support for the court's conclusion that Remington "knowingly and intentionally declined to … hire the necessary compliance personnel." SA105. When Remington purchased AAC, that company had just a dozen employees, three of whom already had compliance responsibilities. JA330, 336, 339, 396, 415. Under those circumstances, it

55

is hardly surprising that Remington did not prioritize hiring additional compliance personnel. Further, Mustian and Schauble testified, without contradiction, that it was "difficult" to find qualified ATF compliance experts in the "rather small" industry. JA339, 357 ("not an easy skill set to find").

After Brittingham and Thompson's suspension, Remington hired Jerry Jackson, and then John Stevens, to assist with compliance. Although Stevens had no ATF experience, he had a long prior career in federal law enforcement, contacts with the Atlanta ATF, and compliance experience in other areas. He also attended a four-day training course with FGI's outside ATF compliance counsel. Stevens quickly recognized what Brittingham already knew: that NFA firearms, including machine guns, with unknown provenance, were handled and strewn about the AAC premises in violation of the law.

Further, the fact that Remington hired a "real" compliance specialist immediately after they fired Brittingham does not show bad faith; in fact, it shows the opposite. That specialist, Cory Weisnicht, testified he would not have been interested in the job while Brittingham was at AAC because the two "did not see eye to eye" on compliance issues—that is, that Brittingham did not take compliance seriously enough for Weisnicht. JA418.

*Second*, even if Remington's compliance efforts were inadequate, there is no evidence whatsoever to support the conclusion that it "intentionally" allowed noncompliance in order to set Brittingham up to fail. SA106 (holding that "defendants knowingly and intentionally declined to ... actively participate in the post-acquisition transition; conduct a far earlier audit of the bound books; purchase the firearms necessary for AAC to conduct its business without relying on those listed on the Old-AAC FFLs; ensure the proper legal and physical transfer of firearms post-acquisition; maintain appropriate firearm protocol; provide sufficient support to AAC as an entity, etc."). To the contrary, shortly after purchasing AAC, Remington shut it down for a month—presumably at significant expense—in order to iron out compliance issues with its suppliers. JA188.

Moreover, Remington executives were well aware that violations such as those demonstrated by the Knox Williams list "can put us all in jail." JA360, 361 (Schauble specifically pondered what would happen "if the ATF came in at any given time to that facility"). The idea that anyone at Remington *wanted* AAC to be grossly non-compliant makes no sense.

Equally important, Brittingham himself wanted and expected AAC to remain separate from the other Remington-owned companies—so Remington's willingness to leave Brittingham in charge cannot possibly

constitute "bad faith." SA13. Brittingham wanted to maintain the unique, "cool," nonconformist culture of AAC, and he liked the idea that AAC would remain a separate profit-and-loss center, reporting in a special chain directly to Schauble, and through him to the Chief Executive of FGI. SA13. For its part, Remington believed it was buying a company that Brittingham would continue to run on a day-to-day basis. Indeed, Remington framed $8 million in contingent payments specifically to incentivize Brittingham to lead and build AAC. Accordingly, Remington naturally saw its compliance responsibilities in 2010 as primarily to provide training, advice, and occasional visits from Mustian—which it provided, repeatedly. [6]

Overall, the serious failures of compliance at AAC may have been a shared problem—but they do not indicate bad faith by Remington. *E.g.,* SA40 (quoting Cofield recognizing the "sensitivity" around the "different cultures," but worrying that "because we tried to handle [AAC] differently, that contributed to what we are facing"). Having consistently wanted AAC to remain as separate as possible from Remington, Brittingham cannot now complain about a lack of day-to-day hand-holding from Remington. The district court let him have it both ways. That was clear error.

_____

[6] The fact that Brittingham was suspended, not terminated, after the antique silencer incident reflects progressive discipline and above-board practice by Remington. And giving Brittingham a second chance in February 2011 is inconsistent with the idea that he was later fired in bad faith.

**IV. Attorney's fees were awarded in error because the contract here does not "clearly" shift attorney's fees.**

Under an erroneous interpretation of the contract, the district court awarded nearly $1.6 million in attorney's fees to Brittingham for his trial counsel. SA109; SA131; SA145. This Court reviews that interpretation *de novo*. *Carco Grp.*, 718 F.3d at 79. It too should be reversed.

**1. New York law requires contractual fee-shifting provisions to be "unmistakably clear" on that point.**

New York law strongly disfavors abrogating the American rule by awarding attorney's fees to a prevailing party. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) ("Promises by one party to indemnify the other for attorneys' fees run against the grain of the accepted policy that parties are responsible for their own attorneys' fees."); *Gotham Partners, L.P. v. High River Ltd. P'ship*, 76 A.D.3d 203, 204 (N.Y. App. Div. 2010) (calling New York "distinctly inhospitable" to interpreting indemnification provisions as fee shifting).

The leading case is *Hooper Associates v. AGS Computers*. In *Hooper*, the New York Court of Appeals addressed an indemnity provision that stated: "AGS shall at all times indemnify and hold harmless [Hooper] ... against and from any and all claims, damages, liabilities, costs, and expenses, including reasonable counsel fees arising out of ... (i) Any breach

59

by AGS of any express or implied warranty hereunder and any express representation or provision hereof." 548 N.E.2d at 903 n.1. Hooper sued AGS for breach of contract and won. *Id.* at 903. The *Hooper* court held that the indemnity provision did not permit Hooper to recover attorney's fees.

Admitting that "the words might seem to admit of a larger sense," the court still declined to permit fee shifting based on them. *Id.* at 905. The court noted that all of the indemnification provisions were "susceptible to third party claims," and that none "support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* Under *Hooper*, an indemnity provision does not require "one party to a contract to indemnify the other for attorney's fees incurred in litigation between them ... unless the intention to do so is unmistakably clear from the language of the promise." *Id.*

Following *Hooper*, this Court has held that "it is particularly important under New York law" that "the language of the agreement be 'unmistakably clear'" that "the parties to the agreement intend provisions of attorney's fees to apply to disputes among themselves." *Coastal Power Int'l Ltd v. Transcontinental Capital Corp.*, 182 F.3d 163, 165 (2d Cir. 1999). In *Coastal Power*, each party agreed to indemnify for "any and all Claims [defined broadly enough to include attorney's fees] … which arise, result

from or relate to any breach of, or failure by an Indemnifying Party to perform, any of its representations, warranties, covenants, or agreements contained in this Agreement." *Id*. This Court concluded that the "agreement at issue here does not clearly state the parties intended the loser in a suit for breach of the agreement to pay the winner's attorney's fees." *Id*. The standard for "clear" statements is thus quite high.

> **2.     The Asset Purchase Agreement is not "unmistakably clear" because it does not "clearly state" that the parties intended the loser in a suit for breach to pay the winner's fees.**

The district court erred by finding that the indemnification provision at §9.2 of the Asset Purchase Agreement required fee shifting. SA131. The court ruled that "defendants are obligated to indemnify Brittingham" because the language of the APA covers intra-party disputes generally. SA131 (holding that "the only entities with standing to sue under §9.2(b) are plaintiffs," that there is no reason for a different §9.4 and §9.5 unless one applies to intra-party claims, and that the Purchase Price and EBITDA Payment mentioned in §9.2 could only refer to intra-party obligations).

The district court mistook the fact that the APA permits indemnity between the parties for their own claims as dispositive proof that it also requires *attorney's fees* between the parties based on that litigation. There is a difference in kind, however, between (a) parties indemnifying each other

61

for injuries suffered by way of each other's breach, including attorney's fees incurred in defending against third party claims; and (b) parties agreeing to set aside the entire American model of attorney's fees and double-down on the outcome of litigation between themselves. Simply mentioning attorney's fees in an ordinary indemnification provision (or definition of "Loss") does not bridge that gap. Attorney's fees for defense are a normal subject of indemnification—a category of damages—when the indemnitee is sued by a third party. Adopting an English rule for attorney's fees, "contrary to the well-understood rule" of American law, is not. *Hooper*, 548 N.E.2d at 905. Thus, a broad indemnification provision, even one that may encompass litigation between the parties, is not sufficiently "clear" to shift fees.

Indeed, the relevant language here is indistinguishable from the provisions in *Coastal Power* and *Hooper* that were found *not* to shift attorney's fees in intra-party disputes. Sections 9.2(a) and (b) require indemnity for "any breach of any warranty or the inaccuracy of any representation of Buyer contained in this Agreement" and for "any breach by Buyer of, or failure by Buyer to perform, any of its covenants or obligations contained in this Agreement." JA682. The language in *Coastal Power* and *Hooper* was no different. *E.g., Hooper*, 548 N.E.2d at 905 (indemnification for "any breach by [defendant] of any express or implied warranty hereunder

and any express representation or provision hereof"); *Coastal Power*, 182 F.3d at 165 (indemnification for "any breach of, or failure by an Indemnifying Party to perform, any of its representations, warranties, covenants or agreements contained in this Agreement").

The district court also erred by gleaning a right to fee shifting from the interplay of §9.4 and §9.5, and from a proviso in §9.2. JA682–83. All of these provisions remain relevant in the context of third-party claims. The proviso in §9.2(b) is designed to limit total indemnification to $4 million, and obviously applies to third-party claims. JA682. The proviso carves out from that $4 million number certain payments that must go only to Brittingham. Although this creates an inference that payments to Brittingham could be part of indemnity, it carefully defines those payments and says nothing about shifting attorney's fees.

Similarly, although §9.4's notice provision could work in the context of a claim between parties, it could also apply to third-party-based indemnity. JA683. Indeed, §9.4 covers notice even outside of "initiation of legal proceedings," as for instance in the case of tax liability to the Government, where no "legal proceeding" may be necessary.

Further, §9.6(d) specifically casts doubt on whether the Asset Purchase Agreement is meant to shift fees between the parties. It states that

63

"[n]o party shall have any liability for any special … damages … suffered or incurred by any other party." JA684. Attorney's fees for a prevailing party are generally considered "special damages." *United Indus., Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 762, 764 (5th Cir. 1996) ("Our sister circuits routinely classify attorney's fees as special damages that must be specifically pleaded."); *Private One of N.Y., LLC v. JMRL Sales & Serv.*, 471 F. Supp. 2d 216, 224 (E.D.N.Y. 2007) (noting that multiple district courts in the Second Circuit have "classified attorney's fees as special damages"). Section 9.6(d) thus limits the availability of attorney's fees, undermining any idea that the Asset Purchase Agreement shifts fees.

In sum, §9 "does not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant." *Hooper*, 548 N.E.2d at 905. The language of §9.2 matches equally broad language in *Hooper* and *Coastal Power* which the New York Court of Appeals and this Court held not sufficient. Cobbling together various provisions that *could* cover intra-party disputes as well as third party ones is not sufficient. *Coastal Power*, 10 F.Supp.2d at 371 (noting that the "word 'Claim' is defined so broadly as to include attorney's fees ... [and] this case certainly arises or relates to breaches of covenant" but adding "the clear message of *Hooper* is that this is not enough"), *aff'd*, 182 F.3d at 165

64

(2d Cir. 1999). It is not "unmistakably clear" that AAC agreed to indemnify Brittingham for attorney's fees arising in disputes between them.

## CONCLUSION

For all these reasons, this Court should reverse the district court's ruling on plaintiffs' claims for breach of contract—including Brittingham's claims for breach of the implied covenant of good faith and fair dealing—and, accordingly, set aside the entire damages award. Alternatively, and at a minimum, this Court should reverse the district court's award of $1.6 million in attorney's fees.

/s/ Matthew A. Fitzgerald
JOHN D. ADAMS
DANA L. RUST
MATTHEW A. FITZGERALD
MCGUIREWOODS LLP
901 East Cary Street
Richmond, VA 23219
Tel: 804.775.4716
Fax: 804.698.2251
*jadams@mcguirewoods.com*
*drust@mcguirewoods.com*
*mfitzgerald@mcguirewoods.com*

LINDA T. COBERLY
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: 312.558.8768
Fax: 312.558.5700
*lcoberly@winston.com*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced typeface using Microsoft Word, in 14 point size.


Dated: September 5, 2014     /s/Matthew A. Fitzgerald
                Matthew A. Fitzgerald

             *Counsel for Advanced Armament*
          *Corp. LLC, & Remington Arms Co., LLC*